Richard S. Mills, Esq.
**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
One Wall Street Plaza
88 Pine Street, 24th Fl.
New York, New York 10015
(212) 483-9490

U.S. DISTRICT COURT

2011 APR -5  P 12: 17

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERNATIONAL TRANSPORT MANAGEMENT CORPORATION and OCEAN NAVIGATOR EXPRESS LINE,<br><br>Plaintiffs,<br><br>vs.<br><br>BROOKS FITCH APPAREL GROUP, LLC,<br><br>Defendant. | Case No.: 11-1921 (DMC)<br><br>**VERIFIED COMPLAINT** |

Plaintiffs International Transport Management Corporation ("ITM") and Ocean Navigator Express Line ("ONEL") through its attorneys, McElroy, Deutsch, Mulvaney & Carpenter LLP, and by way of verified complaint against defendant Brooks Fitch Apparel Group, LLC, say:

### OVERVIEW OF THE ACTION

1. Through this action, plaintiffs seek recourse for defendant's misappropriation, conversion, and embezzlement of goods shipped in international commerce, as well as defendant's failure to abide by its contractual and common-law duties to indemnify and exonerate plaintiffs for its failure to make payment for those wrongfully taken goods.

### THE PARTIES

2. Plaintiff ITM is a New Jersey corporation with a principal place of business located at 129 Washington Street, 3rd Floor, Hoboken, New Jersey 07030.

3. Plaintiff ONEL is a Non Vessel Operating Common Carrier organized pursuant to the laws of the Peoples' Republic of China, having a principal office in Hong Kong, PRC.

4. Upon information and belief, defendant Brooks Fitch Apparel Group LLC ("Brooks Fitch") is a limited liability company organized under the laws of the State of New York and having a principal place of business located at 1370 Broadway, Suite 1100, New York, New York 10018, that does business in the State of New Jersey. The principal of Brooks Fitch is Joseph Safdieh, who does business in some countries under the alias of John Sutherland.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this action, as the parties are citizens of different states, and the amount in controversy exceeds the sum of $75,000.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3).

## BACKGROUND

### A. An Overview of the International Shipping Process

7. Plaintiff ITM is an "ocean transport intermediary" licensed by the Federal Maritime Commission, as that term is used in the provisions of Title 46, Chapter 409 of the United States Code.

8. Plaintiff ITM is involved in shipping in international commerce, and engages in the business of, among other things, international freight forwarding and acting as "release agent" for certain common carriers such as ONEL.

9. Plaintiff ONEL is also involved in shipping in international commerce, and engages in the business of operating as a non-vessel operating common carrier ("NVOCC") licensed by the Federal Maritime Commission.

10. Generally, freight forwarders such as ITM are responsible for arranging the administration and logistics attendant to the shipping of goods in international commerce on behalf of its customers.

11. Among other things, freight forwarders arrange for merchandise to be placed upon vessels in international transit, the payments of applicable freight charges, tariffs and duties, and the processing of bills of lading and similar documentation.

12. Generally, when goods are to be shipped internationally, the carrier (such as ONEL) takes possession of the goods at the port of embarkation and issues a Bill of Lading to the shipper. Pursuant to the Bill of Lading, the carrier is generally liable to the shipper for the value of the goods.

13. A non-vessel operating common carrier, such as ONEL, buys space aboard a ship and then sells that space to various small shippers, consolidates their freight, and issues bills of lading.

14. When those goods are then shipped to the U.S., the importer of record will have their licensed customs broker file entry on their behalf. Documents required (generally copies of a Bill of Lading, Commercial Invoice, and/or Packing List) by U.S. Customs and Border Protection ("CBP") are filed electronically through the Automated Broker Interface ("ABI") at the port of entry. This documentation has to be filed within 10 working days of the vessel's arrival.

15. The goods are not legally entered into the U.S. until CBP issues a release through the ABI system directly to the customs broker as well as to the ocean carrier. The carrier will pass the release on to the terminal who will post the release on their public website. Estimated

duties are then payable within 10 days of the entry date. For this entry process, evidence of a surety bond posted to cover any potential duties, taxes or charges that may accrue is required.

16. Upon arrival in the U.S., imported goods are generally stored at the carrier's terminal under the control of CBP as well as the ocean carrier.

17. In addition to the release by CBP, a release by the ocean carrier is also required. The carrier's release is facilitated by surrendering the original bill of lading which constitutes the document of title for the shipment, as well as the payment of all freight and terminal charges due.

18. After the goods have cleared customs, and are released by the ocean carrier, they are generally moved by the customs broker or freight forwarder to the ultimate delivery address.

**B.  Operative Facts Relating to the Present Case**

19. In the present case, ITM arranged for shipment of goods into the U.S. for defendant, and for the payment of applicable freight charges, customs, tariffs, taxes and duties.

20. In particular, on or about the dates and ports of destination stated in the bills of lading attached as Exhibit A hereto, ITM arranged for shipments (the "Shipments") of certain commercial goods (primarily children's clothing) (the "Goods") to the ports of Los Angeles and Long Beach, California, Elizabeth/Newark, New Jersey and New York, New York from manufacturers in the Peoples' Republic of China (the "PRC Manufacturers") as well as Cambodia.

21. In addition, ITM acted as the "release agent" for ONEL.

22. ONEL acted as the carrier for the Shipments, and made arrangements with the applicable shipping line(s). Upon issuance of the Bills of Lading, ONEL became secondarily liable to the PRC Manufacturers for payment for the Goods.

23. In its capacity as release agent for ONEL, ITM agreed to indemnify ONEL in the event that its secondary liability to the PRC Manufacturers was ever triggered.

24. Generally, goods are not released by a carrier from the shipowner's dockside terminal until such time as the importer has paid for the goods in full. The cost of storage at these dockside warehouses, however, is prohibitively expensive.

25. As an accommodation to defendant, the defendant, ITM and ONEL entered into an alternate arrangement whereby goods could be removed from the dockside terminal to a mutually agreed upon (but significantly less expensive) warehouse (the "Storage Warehouse") pending final payment from defendant to the PRC Manufacturers. Copies of the transfer orders allowing the Goods to be sent to the Storage Warehouse are attached as Exhibit B.

26. To protect ITM and ONEL from liability to the PRC Manufacturers for the early release of the goods from the dockside, defendant and ITM agreed that defendant would indemnify, hold harmless, and exonerate ITM from any claims made by the PRC Manufacturers (through ONEL) and provided negotiable instruments (the "Checks") to ITM in the amounts due to the PRC Manufacturers, with the understanding that such instruments would be presented for payment if defendant failed to make payment to the PRC Manufacturers. Copies of these Checks are attached hereto as Exhibit C.

27. As part of their contractual arrangement the parties agreed that defendant would be named as "Importer of Record," a designation that identifies the party designated to interact with the CBP in matters related to compliance with customs regulations.

28. Ultimately, the Goods arrived in the United States and passed customs clearance. Accordingly, the Goods were legally allowed to be removed from the CPB-controlled terminal to the Storage Warehouse.

29. By its own actions, or through the actions of an agent, and with the assistance of unknown individuals, defendant managed to wrongfully divert the Goods from being sent to the Storage Warehouse to an unknown facility.

30. Upon information and belief, defendant thereafter caused the Goods (which it does not own, and which it has not paid for) to be shipped outside of the United States.

31. Throughout defendant failed and refused to pay the PRC Manufacturers, ITM or ONEL for the Goods.

32. The PRC Manufacturers, in turn, demanded payment from ONEL in accordance with the Bills of Lading.

33. ONEL, in turn, has indicated that it intends to hold ITM, as release agent, liable for these damages.

34. In light of ONEL's and ITM's liability for the Goods, and in a good faith attempt to discharge defendant's obligations to the PRC Manufacturers, ITM presented the Checks for payment.

35. Defendant wrongfully stopped payment on the Checks.

36. The PRC Manufacturers have not been paid by defendant.

37. Upon information and belief, the PRC Manufacturers could not or did not pay certain of their employees in China, and told those employees that they were not being paid because of ITM's, ONEL's and its affiliates' failure to pay for the Goods.

38. On or about March 24th 2011, the unpaid workers of three of the PRC Manufacturers rioted at the office of ONEL in Shanghai, China. Private Security contractors had to be called in to extract the employees trapped in the office, which was then set upon by the mob.

39. Upon information and belief, many of these individuals were employees of the PRC Manufacturers, who acted in retribution for defendant's non-payment of the Goods, and such individuals continue to threaten harm to ONEL's facilities and violence against ONEL's employees.

40. ONEL is suffering, and will continue to suffer, irreparable harm in the potential destruction of its facilities and the ongoing threats to the physical safety of its workers.

41. As a consequence of the foregoing, ITM's affiliates and other business conduits essential to ITM's continued operation in the entire Pacific Rim region as well as the United Kingdom, have indicated their unwillingness to continue their affiliation with ITM unless and until payment in full is made to the PRC Manufacturers, or the stolen Goods are returned to China.

42. In addition, both the PRC Manufacturers have indicated their unwillingness to do business with ITM, ONEL and any of their affiliated entities in China unless and until payment is made.

43. Plaintiffs are thus suffering, and will continue to suffer, financial damages, property damage, and reputational damage both in the U.S. and in the PRC as a result of defendant's failure and refusal to discharge its obligations.

## COUNT ONE
## FRAUD

44. Plaintiffs repeat and reallege Paragraphs 1-43 above as if fully set forth herein.

45. In connection with the Shipments, the defendant represented to ITM and ONEL that it would pay for the Goods, pay applicable fees, allow the Goods to be transferred to the Storage Warehouse, and discharge all obligations owed to ITM, ONEL, and the PRC Manufacturers.

46.   Defendant intended that ITM and ONEL would rely on its representations.

47.   ITM and ONEL reasonably relied on defendant's representations.

48.   Defendant knew, or reasonably should have known, that it would not pay in full for the Goods, pay the applicable fees, allow the Goods to be transferred to the Storage Warehouse, and discharge all obligations owed to ITM, ONEL, and the PRC Manufacturers.

49.   In particular, Defendant specifically directed that the Goods be diverted from the Storage Warehouse to points unknown.

50.   ITM's and ONEL's reliance upon defendant's representations caused injury.

## COUNT TWO
## CONVERSION

51.   Plaintiffs repeat and reallege Paragraphs 1-50 above as if fully set forth herein.

52.   As carrier, Plaintiff ONEL had a clear right to possess and control the Goods from their pickup in China, through their delivery to the ports of destination described on Exhibit A hereto, and until duly released at the Storage Warehouse.

53.   Defendant wrongfully took possession of, and interfered with ONEL's lawful possession of, the Goods.

54.   Defendant wrongfully exercised dominion and control over the Goods to the detriment of Plaintiffs' superior rights.

55.   Defendant's conversion of the goods resulted in damages to Plaintiffs.

## COUNT THREE
## BREACHES OF CONTRACTS

56.   Plaintiffs repeat and reallege Paragraphs 1-55 above as if fully set forth herein.

57.     Plaintiff ITM and defendant entered into an agreement pursuant to which ITM would provide freight forwarding services to defendant in exchange for payment and defendant's discharge of all obligations (including the obligation of payment) to the PRC Manufacturers.

58.     Plaintiff ITM and defendant also agreed that, upon the clearance through customs, the parties would jointly ensure that the Goods were transferred from the dockside terminal to the Storage Warehouse until such time as payment in full was made by defendant to the PRC Manufacturers.

59.     Plaintiff ITM and defendant also agreed that defendant would deposit with ITM sufficient sums to cover any liability that ITM incurred (whether on its own behalf or through ONEL) to the PRC Manufacturers.

60.     In conjunction with the aforesaid agreements defendant entered into contracts of indemnity with the ITM obligating it to defend, indemnify and hold plaintiff harmless from and against all loss costs and expenses, including legal expenses, incurred by plaintiff by reason of, among other things, the defendant's failure to perform its payment and other obligations with respect to the Goods.

61.     Plaintiff ITM fully performed all of its obligations under the contacts.

62.     Defendant failed and refused to perform all of its obligations under the contract. In particular, defendant failed to make payment to the PRC Manufacturers for the Goods, and thereafter failed to defend, indemnify or exonerate ITM and hold it harmless from all claims arising from its default as it promised to do.

63.     Plaintiff ITM was damaged as a result of defendant's breaches.

## COUNT FOUR
## EMBEZZLEMENT

64.     Plaintiffs repeat and reallege Paragraphs 1-63 above as if fully set forth herein.

65.  Defendant's designation as importer of record did not afford it any right, title or interest in the Goods, although defendant may have misrepresented its status and rights in order to induce the respective warehousemen holding the Goods to allow defendant to obtain possession and or control over the same.

66.  Defendant took custody, and purposefully retained custody, of the Goods with full knowledge and awareness that such custody could only be lawfully taken in exchange for full payment to the PRC Manufacturers and/or plaintiffs.

67.  Despite not having made the required payment to the PRC Manufacturers or plaintiffs, defendant dealt with the Goods as though they were its own.

68.  Defendant failed to make the required payments necessary to take lawful possession of the Goods.

69.  Plaintiffs were damaged by defendant's surreptitious theft of the Goods and further damaged by its failure to make the required payments.

## COUNT FIVE
## REPLEVIN

70.  Plaintiffs repeat and reallege Paragraphs 1-69 above as if fully set forth herein.

71.  At the time of defendant's wrongful taking of the Goods, ONEL had the proper and exclusive right to possession of the Goods.

72.  ITM and ONEL have both demanded that defendant return the Goods or make proper payment therefor.

73.  Defendant has failed and refused to return the Goods or make proper payment therefor.

74.  Plaintiffs were damaged by defendant's failure and refusal to return the Goods or make proper payment therefor.

## COUNT SIX
## IMPOSITION OF A CONSTRUCTIVE TRUST

75. Plaintiffs repeat and reallege Paragraphs 1-74 above as if fully set forth herein.

76. Defendant's taking of the Goods was illegal and wrongful.

77. At the time of such taking, ITM and ONEL both had an equitable and/or beneficial interest in the Goods, subject to full payment and discharge by defendant.

78. Defendant failed and refused to make such payment and/or discharge its duties.

79. Without disgorgement, defendant has been and will continue to be unfairly enriched by its wrongful taking and use of the Goods.

80. By reason of the foregoing plaintiffs are entitled to the imposition of a trust over any and all goods, funds and assets held by or owed to the defendant in an amount equal to the value of the Goods at the time that defendant wrongfully diverted the same to its exclusive possession and or control.

## COUNT SEVEN
## EXONERATION

81. Plaintiffs repeat and reallege Paragraphs 1-80 above as if fully set forth herein.

82. As between ITM and the defendant, ITM is secondarily obligated (through ONEL) to make payment to the PRC Manufacturers, while the defendant is primarily obligated to make such payment, and otherwise owes a duty to ITM to procure the discharge of all obligations relating to the Goods.

83. Defendant has failed and refused, and continues to fail and refuse, to satisfy the obligation of exoneration to ITM and obligation of payment to the PRC Manufacturers.

84. ITM is entitled to be exonerated and indemnified by the defendant for any and all loss incurred and to be incurred in connection with the Shipments.

85. As a result of the defendant's failure to honor its obligations relating to the Shipments, ITM has sustained and will continue to sustain damages.

## COUNT EIGHT
## ATTACHMENT

86. Plaintiffs repeat and reallege Paragraphs 1-85 above as if fully set forth herein.

87. In light of the foregoing the facts set forth above, there is a reasonable and probable likelihood that plaintiffs will be successful on the merits of their claims.

88. There are statutory grounds for attachment under New Jersey law.

89. Discovery is likely to demonstrate the existence of property of the defendant subject to attachment that is located within the State of New Jersey.

90. Attachment of said property is warranted and necessary to protect plaintiffs' to enforce any potential judgment arising out of defendant's wrongful acts, or to interplead such funds with this court until such time as the court can resolve the underlying controversy.

## COUNT NINE
## INDEMNITY

91. Plaintiffs repeats and realleges Paragraph 1- 90 above as if fully set forth herein.

92. The Indemnity Agreement executed by ITM and the defendant herein are annexed hereto as Exhibits D, E, and F respectively, and are hereby incorporated herein by reference.

93. The defendant has failed and refused to defend, indemnify or hold harmless ITM, as it is obligated by the aforesaid indemnity agreements to do.

94. ITM and defendant have executed similar indemnity agreements with respect to shipments of goods made prior and in addition to the Shipments designated in Exhibit A hereto.

95. Plaintiffs have learned of claims by other manufacturers in China who assert that they have not been paid in full for the goods they have shipped to the defendant via the plaintiffs

herein, and upon information and belief those claims are being filed or readied for filing against the plaintiffs in the Chinese courts, and elsewhere.

96.     Defendant has wrongfully failed and refused to defend, indemnify or otherwise hold ITM harmless for the costs, expenses and damages incurred, or about to be incurred by reason of defendant's contractual defaults and unlawful conduct alleged hereinabove.

97.     Defendant has deliberately and willfully obstructed the self-help mechanism adopted by the parties to secure the indemnity obligation owed by defendant to plaintiff, and the full-payment obligation owed by defendant to the PRC Manufacturers, and other manufactures that shipped goods to the United States in the same way as described hereinabove.

98.     In particular, upon information and belief, defendant has issued stop payment orders and\or defunded the accounts at Chase Bank upon which the negotiable instruments placed with plaintiff by defendant as security against a default on its payment and indemnity obligations were drawn.

99.     Plaintiff has not received or been credited with the proceeds of the negotiable instruments drawn upon defendant's accounts at Chase Bank, that ITM deposited into its bank accounts, and has thereby been exposed to claims and liability for damages in violation of the agreements of indemnity.

100.    Plaintiffs have no adequate remedy at law.

101.    Plaintiff ITM is entitled to an order, judgment and decree compelling the defendant to forthwith defend, indemnify and hold the plaintiff harmless from any and all claims arising out of defendant's aforesaid conduct and omissions, and to a further order directing the defendant to make payment in full to or for the benefit of the PRC Manufacturers, and\or an order directing the defendant to forthwith interplead into this Court, and deposit with the Clerk of

the Court funds sufficient to discharge the defendant's aforesaid payment, defense, and indemnity obligations in an amount no less than $5 million dollars, or, to post a bond by a surety approved by Treasury Department of the United States (via Circular 570) in a like amount pending resolution of the instant action.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor, and against defendant:

(a) awarding damages, including compensatory and punitive damages, in an amount to be determined by the court;

(b) imposing a constructive trust upon the Goods and/or the proceeds thereof;

(c) requiring the defendant to return to the Goods to ONEL;

(d) compelling the defendant to forthwith defend, exonerate, indemnify and hold the plaintiff harmless from any and all claims arising out of defendant's aforesaid conduct and omissions;

(e) directing the defendant to make payment in full to or for the benefit of the PRC Manufacturers, and\or an order directing the defendant to forthwith interplead into this Court, and deposit with the Clerk of the Court funds sufficient to discharge the defendant's aforesaid payment, defense, and indemnity obligations in an amount no less than $5 million dollars, or, to post a bond by a surety approved by Treasury Department of the United States (via Department Circular 570) in a like amount pending resolution of the instant action.

(f) awarding Plaintiffs attorneys' fees and costs of suit;

(g) awarding Plaintiffs such other or further relief as the court may deem just and proper.

Dated: New York, New York
      April 5, 2011

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

By: _/s/ Richard S. Mills_
Richard S. Mills
One Wall Street Plaza
88 Pine Street, 24th Fl.
New York, New York 10015
(212) 483-9490

Attorneys for Plaintiffs

2011 APR -5 P 12: 17   U.S. DISTRICT COURT

## VERIFICATION OF COMPLAINT

Wolfgang Schmid, of full age, hereby certifies as follows:

I am the Co-Owner, President, and duly authorized agent of Plaintiff, International Transport Management Corporation, in the within lawsuit. I have read the allegations in the foregoing Verified Complaint. The allegations contained therein are true and accurate to the best of my knowledge and belief.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

Dated: April 4, 2011                             _____
                                                              WOLFGANG SCHMID

2011 APR -5  P 12: 17
U.S. DISTRICT COURT