NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| INTERNATIONAL TRANSPORT MANAGEMENT CORPORATION, and OCEAN NAVIGATOR EXPRESS LINE | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| vs. | Civil Action No. 11-CV-1921 (DMC) |
| BROOKS FITCH APPAREL GROUP, LLC | |
| Defendant. | |

 DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by International Transport Management Corporation ("ITM" or "Plaintiff") for an order to show cause as to why a temporary restraining order and preliminary injunction should not be issued against Brooks Fitch Apparel Group, LLC ("Brooks Fitch" or "Defendant"). Oral argument was heard on April 7, 2011 at 10:00 a.m. After considering the submissions of all parties and the oral argument, it is the decision of this Court, for the reasons herein expressed, that Plaintiff's request for relief is **denied**.

I.    BACKGROUND[1]

A.    The Parties

Plaintiff ITM is a New Jersey corporation with its principal place of business in Hoboken,

---

[1] These facts have been adopted from the parties's respective submissions.

New Jersey.  Ocean Navigator Express Line ("ONEL") is a non vessel operating common carrier organized pursuant to the laws of the People's Republic of China ("PRC"), having a principal office in Hong Kong, PRC.[2]  Plaintiff ITM is an "ocean transport intermediary" involved in the shipping of goods in international commerce, and engaged in the business of international freight forwarding and acting as a "release agent" for certain common carriers, including ONEL.

Defendant Brooks Fitch is a limited liability corporation organized under the laws of the state of New York and having a principle place of business located in New York, New York, that does business in New Jersey.

B.     Overview of International Shipping Process

Generally freight forwarders, such as Plaintiff, are responsible for arranging the administration and logistics attendant to the shipping of goods in international commerce on behalf of its customers.  Freight forwarders arrange for merchandise to be placed upon vessels in international transit, the payments of applicable freight charges, tariffs, and duties, and the processing of bills of lading and similar documentation.

Generally when goods are shipped internationally, the carrier, such as ONEL, takes possession of the goods at the port of embarkation and issues a bill of lading to the shipper.  Pursuant to the bill of lading, the carrier is generally liable to the shipper for the value of the goods.  A non-vessel operating common carrier, such as ONEL, buys space aboard a ship and then sells that space to small shippers, consolidates their freight and issues bills of lading.

When goods are shipped to the U.S., the importer of record will have their licensed customs

---

[2]ONEL is named as a Plaintiff in the verified complaint and appears in the caption on the verified complaint papers.  However, ONEL is not named as a moving party in the Order to Show Cause, nor is it named in the caption on those papers.

brokers file entry on their behalf. Documents required by U.S. Customs and Border Protection ("CBP") must be filed within 10 days of the vessel's arrival. The goods are not legally entered into the U.S. until the CBP issues a release directly to the customs broker and the ocean carrier. The carrier will pass the release onto the terminal who will post the release on their public website. Estimated duties are payable within 10 days of the entry date. For the entry process, evidence of a surety bond posted to cover any potential duties, taxes, or charges that may accrue is required.

Upon arrival in the U.S., imported goods are generally stored at the carrier's terminal under control of the CBP and the ocean carrier. In addition to the release by the CBP, a release by the ocean carrier is also required. The carrier's release is facilitated by surrendering the original bill of lading, which constitutes the document of title for shipment, as well as the payment of all freight and terminal charges due. After the goods have cleared customs and are released by the ocean carrier, they are generally moved by the customs broker or freight forwarder to the ultimate delivery address.

C.      Plaintiff's Verified Complaint

Plaintiff arranged for the shipment of goods into the U.S. for Defendant and for the payment of applicable freight charges, customs, tariffs, taxes, and duties. The shipments at issue are specified in the bills of lading attached as Exhibit A to Plaintiff's verified complaint. The shipments were for commercial goods to the ports of Los Angeles and Long Beach, California, Elizabeth/Newark, New Jersey, and New York, New York from manufacturers in the Peoples' Republic of China ("PRC manufacturers") and Cambodia. Additionally, Plaintiff acted as the "release agent" for ONEL.

ONEL acted as the carrier for the shipments, and made arrangements with the applicable shipping line(s). Upon issuance of the bills of lading, ONEL became secondarily liable to the PRC manufacturers for payment of goods. As its release agent, Plaintiff agreed to indemnify ONEL in

the event its secondary liability to PRC manufacturers was ever triggered.

Generally goods are not released by a carrier from the shipowner's dockside terminal until the importer has paid for the goods in full.  However, the cost of storage at the dockside warehouses is prohibitively expensive, so Plaintiff and Defendant agreed to transfer the goods from the dockside to a storage warehouse pending final payment from Defendant to PRC manufacturers.  Plaintiff asserts that Defendant agreed to indemnify, hold harmless, and exonerate any claims made by PRC manufacturers (through ONEL) and Defendant provided checks to Plaintiff in the amounts due to the PRC manufacturers, with the understanding that such instruments would be presented for payment if Defendant failed to pay the PRC manufacturers.  The parties also agreed Defendant would be named "Importer of Record," which identified Defendant as the party designated to interact with CBP in compliance matters.

The goods arrived in the U.S., passed customs clearance, and were legally allowed to be removed from the CBP controlled terminal to the storage warehouse.  Plaintiff asserts Defendant wrongfully diverted the goods from being sent to the storage warehouse to an unknown facility, and, based upon Plaintiff's information and belief, Defendant thereafter caused the goods to be shipped out of the U.S.  Defendant has not paid PRC manufacturers, Plaintiff or ONEL for the goods.

Based on the bills of lading PRC manufacturers demanded payment from ONEL, who in turn indicated it intends to hold Plaintiff, as its release agent, liable for any damages.  In response, Plaintiff presented the checks to discharge Defendant's debt, but Defendant stopped payment on the checks.

The PRC manufacturers still have not been paid by Defendant.  PRC manufacturers could not, or did not, pay their employees, and told those employees they were not being paid because of

4

Plaintiff's, ONEL's and its affiliates' failure to pay for the goods.  On March 24, 2011, the unpaid workers of the PRC manufacturers allegedly rioted at the office of ONEL in Shanghai, China, and private security had to be called in to protect the ONEL employees.  These PRC employees are allegedly continuing to threaten harm to ONEL facilities and employees.

Plaintiff's affiliates and other business conduits essential to Plaintiff's continued operation in the Pacific Rim, and in the United Kingdom, have indicated an unwillingness to continue their affiliation with Plaintiff unless and until payment is made in full to PRC manufacturers or the goods are returned.  Additionally, PRC manufacturers have indicated their unwillingness to do business with Plaintiff, ONEL, and any other affiliates in China unless and until payment is made.

Based on the foregoing, Plaintiff brought claims for  fraud, conversion, breach of contract, embezzlement, replevin, imposition of a constructive trust, exoneration, attachment and indemnity against Defendant.

D.     Defendant's Opposition

Defendant argues that Plaintiff's motion is without merit because Plaintiff has no cognizable claim as it authorized the release of the goods in question, is not the manufacturer of the goods, and is not entitled to payment for such goods.  First, Defendant challenges Plaintiff's assertion that Defendant improperly removed goods from the storage warehouse without Plaintiff's knowledge. In support of its argument, Defendant points to an email from Plaintiff to the warehouse directing it to release the goods to Defendant.  However, the email initially referenced by Defendant is from April 19, 2010 and pertains to a shipment that is *not* at issue here.  Since the fact that Plaintiff previously, and for other shipments, released goods to Defendant does not mean Plaintiff did so with regard to the shipments at issue here, this Court requested Defendant provide additional

5

documentation.  Following oral argument, Defendant submitted numerous emails from Plaintiff to the storage warehouse authorizing the release of many of the shipments identified in the bills of lading submitted by Plaintiff.  Defendant also argues that the custom and practice of the parties was for Plaintiff to release the goods in return for being provided with a post-dated check for the amount due the manufacturer, and for the Defendant to later pay the manufacturer directly based on arrangements between the Defendant and manufacturer.  Defendant argues that Plaintiff sought to defraud Defendant when it tried to deposit millions of dollars worth of these checks on March 30, 2011, including checks that were outdated and unrelated to the specific shipments at issue.  For example, Defendant notes that Plaintiff tried to cash check 7515 dated April 30, 2010, which was included in Plaintiff's Exhibit C.  Defendant asserts that upon receipt of check 7515, Plaintiff released the goods to Defendant on April 19, 2010 and that on May 17, 2010, Defendant paid the manufacturer in full and sent confirmation to Plaintiff. Nonetheless, Plaintiff tried to cash this check on March 30, 2011.  Finally, Defendant argues it did not provide Plaintiff with broad indemnity relating to the goods, but rather only with indemnity relating to the specific shipments identified in the three indemnification agreements.

        E.       Relief sought by Plaintiff

Plaintiff is seeking an order: (1) imposing a constructive trust upon the goods and/or the proceeds thereof; (2) requiring Defendant to return the goods to Plaintiff; (3) compelling Defendant to defend, indemnify, and hold Plaintiff harmless from any and all claims arising out of Defendant's possession of the goods; (4) directing Defendant to make payment in full to, or for the benefit of, the manufacturers and/or an order directing Defendant to interplead into this Court and deposit with the Clerk of the Court funds sufficient to discharge the aforesaid payment, defense, and indemnity

obligations in an amount no less than $5 million dollars; and (5) require Defendant to show evidence of its title to the goods.

## II.   LEGAL STANDARD

"A decision to grant or deny a preliminary injunction is within the sound discretion of the district court." Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., 2010 WL 2428561 (D.N.J. June 9, 2010) (citing Oakley, Inc. v, Sunglass Hut Int'l, 316 F.3d 1331,1339 (Fed. Cir. 2003)); see also Spartacus, Inc. v. Borough of McKees Rocks, 694 F.2d 947, 949 (3d Cir. 1982).  In determining whether a preliminary injunction should be granted, a district court must consider four factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.

Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir. 1994); see also ACLU of New Jersey v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996); CIBA-GEIGY Corp. v. Bolar Pharm. Co., Inc., 747 F.2d 844, 850 (3d Cir. 1984) cert. denied 471 U.S. 1137 (1985).  Plaintiff bears the burden of showing that these factors weigh in favor of granting the injunction. Kos Pharm. Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).  "Only if the movant produces evidence sufficient to convince the [court] that all four factors favor preliminary relief should the injunction issue." Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990); see also Nutrasweet Co. v. Vit-Mar Enter. Inc., 176 F.3d 151, 153 (3d Cir. 1999).  Furthermore, the Third Circuit has repeatedly held that a preliminary injunction is an "*extraordinary remedy*" that "should be granted only in limited circumstances."  Kos Pharm.

Inc., 369 F.3d at 708 (emphasis added); see also Am. Tel. & Tel. Co. v. Winback & Conserve

Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994).

## III.   DISCUSSION

At the outset, this Court notes that it has been difficult to determine what has occurred

with the shipments at issue.  As this Court stated during oral argument, Plaintiff's moving papers

and Defendant's opposition are not a picture of clarity.  Both Plaintiff and Defendant submitted

additional documents during oral argument, and in the days following, which have provided only

minimal elucidation.

This Court has spent an inordinate amount of time going through the papers and trying to

determine what exactly is going on with the shipments, checks, and indemnity agreements at

issue.  For example, 20 bills of lading for various shipments are attached as Exhibit A to

Plaintiff's Verified Complaint, but not all of the checks submitted in Exhibit C match up to these

shipments.[3]  Additionally, based on the Verified Complaint it appeared that all 20 shipments in

Exhibit A were alleged to have been secretly diverted, and it was only during oral argument that

Plaintiff clarified its position that *some* of these shipments had been diverted while others simply

remained unpaid.  During oral argument, Plaintiff submitted two additional charts to this Court,

---

[3]At oral argument, and in the documents filed following oral argument, Plaintiff asserted that it was entitled to cash these checks even though in several cases the check was nearly a year old and/or represented collateral for a shipment already paid for.  As Plaintiff sees it, the checks represented collateral for goods from a specific manufacturer, and therefore Plaintiff was entitled to deposit these checks to pay the balance owed to the manufacturer, regardless of the connection to any specific shipment.  This Court does not find Plaintiff's argument persuasive, particularly where the custom and practice of the parties indicates that the checks were collateral for the specific shipments referenced and some of the checks were clearly outdated.  However, even assuming Plaintiff was entitled to deposit these checks, Defendant's decision to stop payment would not constitute irreparable harm and therefore it has no bearing on this Court's decision.

8

one titled "Cargo Shipments Secretly Diverted by BFAG,[4]" and another chart titled "Summary Schedule of Shipments Not Fully Paid by BFAG, Including Shipments Diverted by BFAG."  The first chart listed 13 shipments that were allegedly diverted by Defendant, and the bills of lading for these shipments were included in Exhibit A.  However, the second chart included those same 13 shipments, as well as 22 other shipments that are apparently at issue.  Since only 20 bills of lading were submitted in Exhibit A and there are 35 shipments at issue, this Court was not provided with bills of lading for all of the shipments at issue.  This is just one example where, despite this Court's attempt to piece together the information provided, incongruities and gaping holes exist which prevent this Court from being able to decipher exactly what transpired.

A. Irreparable Harm

This Court first addresses whether Plaintiff can demonstrate irreparable harm, since "[in] the absence of irreparable injury, no preliminary injunction would lie, even if the other three elements... were found."  Nutrasweet Co., 176 F.3d at 153.  "Establishing a risk of irreparable harm is not enough.  A plaintiff has the burden of proving a 'clear showing of immediate irreparable harm'" absent injunctive relief. Hoxworth v. Blinder, Robinson & Co. Inc., 903 F.2d 186, 205 (3d Cir. 1990) (citing ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 225 (3d Cir. 1987)). "Irreparable harm must be established as a separate element, independent of any showing of likelihood of success; irreparable harm can [not] be presumed." King Pharm. Inc. V. Sandoz, Inc. 2010 WL 1957640, *5 (D.N.J. May 17, 2010) (citing Winter v. Natural Resources Defense Counsel, Inc., 129 S. Ct. 365, 375-76 (2008)). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable

---

[4]BFAG refers to Brooks Fitch Apparel Group.

remedy following a trial."  Instant Airfreight Co. v. C.F. Airfreight, Inc., 882 F.2d 797, 801 (3d

Cir. 1989).  Thus, the "preliminary injunction must be the *only* way of protecting the plaintiff

from harm."  Id. (emphasis added); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3d

Cir. 1994).  Irreparable injury occurs when money damages are difficult to ascertain or would be

inadequate.  In re Arthur Treacher's Franchise Litig., 689 F.2d 1137, 1146 (3d Cir. 1982); see

also Opticians Ass'n of America, 920 F.2d at 195 ("Irreparable harm must be of a peculiar nature

so that compensation in money alone cannot atone for it.") (internal citations omitted).  Failure to

establish irreparable injury automatically results in denial of a preliminary injunction. Instant

Airfreight Co., 882 F.2d at 800; see also Nutrasweet Co., 176 F.3d at 153 ("In the absence of

irreparable injury, no preliminary injunction would lie, even if the other three elements... were

found.").

　　　　Here, Plaintiff has alleged it is suffering irreparable harm because of loss of goodwill and

damage to its business relationships, a judgment against it in PRC, and the continued threat of

riots by the PRC manufacturers' employees.  With regard to the loss of goodwill and damage to

its business relationships, this Court notes that in any breach of contract case a party may allege

that the breach is negatively impacting its ongoing business.  There may be times that the effect

on other business relationships may rise to the level of irreparable harm.  See Opticians Ass'n of

America, 920 F.2d at 195 ("Grounds for finding irreparable injury include loss of control of

reputation, loss of trade, and loss of good will.").  However, beyond its own assertions, Plaintiff

has not provided this Court with evidence of harm to its business relationships or loss of

goodwill, nor has Plaintiff demonstrated any alleged harm is irreparable and that a preliminary

injunction is the *only* way to protect Plaintiff's interests.  With regard to the judgment levied

against Plaintiff in PRC, this Court first notes that, aside from the affidavit of Wolfgang Schmid ("Schmid affidavit"), which was submitted to this Court after oral argument and states that judgments have been paid and/or are pending in PRC, Plaintiff has not provided any proof of the judgment.  However, even with such proof, Plaintiff has failed to demonstrate why money damages are an insufficient remedy.  As to the threat of riots from the PRC manufacturers' employees, this Court does not find that the irrational behavior of workers on another continent is a sound basis for entering a preliminary injunction against Defendant.

Plaintiff has also argued that it will suffer irreparable harm if Defendant is not compelled to perform under the indemnity agreement because Plaintiff will be unable to later avail itself of the contractual rights of exoneration.  Although Plaintiff claimed in its moving papers and at oral argument that a broad indemnification exists between the parties, Plaintiff only submitted three such agreements to this Court.  The documents provide that Defendant agreed to indemnify, hold harmless, and defend Plaintiff "from and against any actual or alleged claims, liabilities, losses, demands, causes of action, judgments, settlements and expenses (including, without limitation, settlement costs and legal, accounting, and other expenses in connection therewith), or other damages of any kind or nature arising out of or connected with" the *specific shipments referenced*.  Pl. Verified Compl. Ex. D, E, F.

Based on the evidence submitted, this Court must conclude that no broad, all encompassing indemnity agreement existed between the parties, but rather the agreements pertained only to specific shipments.  Specifically, the indemnity agreement attached as Exhibit D pertains to shipments bearing bill of lading numbers MATS9472810000, NYKS2356883510,

and NYKS2356884790.[5] According to the Schmid affidavit Defendant has not paid for these shipments and the manufacturer commenced proceedings against Plaintiff in China.  The indemnity agreement attached as Exhibit E pertains to the shipment bearing bill of lading number HRZDSH2149229B.  Plaintiff does not assert that Defendant has failed to pay the PRC manufacturer for this shipment, or that the PRC manufacturer has commenced proceedings against Plaintiff in relation to this shipment.  However, according to the Schmid affidavit, Plaintiff attempted to deposit the check Defendant provided as collateral for releasing this shipment but the check was not honored.  The indemnity agreement attached as Exhibit F pertains to shipments bearing bills of lading numbers MCUSQ357539, ONPLQDLGB1120002, and ONPLQDLGB1120003.  In the Schmid affidavit, Plaintiff asserts that the PRC manufacturer has demanded return of the goods because of Defendant's failure to pay, but Plaintiff is unable to comply with the request because it does not know the whereabouts of the goods at issue.

Aside from these assertions in the Schmid affidavit, Plaintiff has not provided this Court with any evidence showing that the balances for these shipments remain unpaid and/or that the PRC manufacturers have commenced proceedings against Plaintiff in China.  Simply put, Plaintiff has not provided this Court with appropriate documentation demonstrating that triggering events have occurred such that Defendant should be compelled to indemnify and hold Plaintiff harmless in accordance with the indemnity agreements.

Plaintiff has not provided this Court with sufficient evidence to establish that it would suffer irreparable harm absent this Court issuing a preliminary injunction.  Since a preliminary

---

[5]These bills of lading were not included with the other bills of lading provided in Exhibit A.

injunction cannot issue unless Plaintiff establishes irreparable harm, this Court need not address the other factors.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's motion for preliminary injunction is denied.  An appropriate Order accompanies this Opinion.

 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Dated:         April  18 ,  2011
Original:      Clerk
cc:            All Counsel of Record
               Hon. J.A. Dickson, U.S.M.J.
               File