NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERNATIONAL TRANSPORT MANAGEMENT COROPORATION, and OCEAN NAVIGATOR EXPRESS LINE,<br><br>Plaintiffs,<br><br>v.<br><br>BROOKS FITCH APPAREL GROUP, LLC and JOSEPH E. SAFDIEH,<br><br>Defendants. | Civil Action No.: 11-1921 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This case involves issues of breach of contract and indemnification arising out of the purchase of goods by Defendant Brooks Fitch Apparel Group, LLC ("Brooks Fitch") from various Chinese manufacturers and the delivery of those goods to Brooks Fitch in New York. Plaintiffs International Transport Management Corporation ("ITMC") and Ocean Navigator Express Line ("ONEL") filed the instant lawsuit against Brooks Fitch on April 5, 2011.[1] (ECF No. 1). Plaintiffs filed an Amended Complaint on September 16, 2014, adding Joseph E. Safdieh, the principal of Brooks Fitch. (ECF No. 89). Plaintiffs alleged two counts of fraud against Defendants Brooks Fitch and Safdieh, counts of conversion, breach of contract, embezzlement, replevin, imposition of a constructive trust, exoneration, attachment, and indemnity against Brooks Fitch, and that Brooks Fitch is the alter-ego of Safdieh. (ECF No. 89 ¶¶ 579–665). This case has a long and complicated history, explained in more detail below, which culminated in a one-day bench trial

---

[1] The parties mutually agreed that ITMC should be dismissed from the case for the purposes of the October 23, 2017 bench trial. (Trial Tr. 30:7–15).

held on October 23, 2017. (ECF No. 182). What follows is the relevant background and the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. BACKGROUND[2]

### A. The Parties

Plaintiff ONEL is a corporation incorporated under the laws of Hong Kong, Special Administrative Region of the People's Republic of China. (ECF No. 189 (Pl.'s Proposed Findings of Fact ("PFOF")) ¶ 20). ONEL is a wholly-owned subsidiary of Cargo Services Far East Limited and functions as an ocean transport intermediary operating as a non-vessel operating common carrier ("NVOCC"). (ECF No. 185 ("Trial Tr.") 39:23–40:9, 41:8–9; ECF No. 131 ("Pls. 56.1") ¶¶ 11–12; ECF No. 138 ("Def. 56.1") ¶¶ 11–12). An NVOCC is a common carrier that does not operate the vessel on which it provides ocean transportation. (Pls. 56.1 ¶ 14; Def. 56.1 ¶ 14). ONEL's primary business is to transport goods from Asia to the United States, and does so by operating through a network of agents. (Trial Tr. 40:3–9, 41:16–20).

Cargo Services Far East Limited is a corporation incorporated under the laws of Hong Kong, Special Administrative Region of the People's Republic of China. (Exs. 3002, 3006). Cargo Services Far East Limited provides logistics, supply chain, and international freight forwarding services for air and ocean cargo. (Trial Tr. 35:16–19). Cargo Services Far East Limited has another wholly-owned subsidiary called Cargo Services (China) Ltd. ("Cargo Services China"). (Trial Tr. 36:9–11). Cargo Services China carries on the same business as Cargo Services Far East Limited, but in mainland China. (Trial Tr. 36:7–37:10, 38:23–39:6). These businesses also have Chinese names, where Cargo Services translates to Jiahong. (Trial Tr. 101:20–22).

Brooks Fitch is a limited liability company organized under the laws of New York. (Pls.

---

[2] The facts set forth herein are the Court's findings of fact, which are based on the Court's observations and credibility determinations of the witnesses who testified and a thorough review of all the evidence admitted at trial.

2

56.1 ¶ 17; Def. 56.1 ¶ 17). Brooks Fitch designed, merchandised, and bought products overseas and sold them to mass retailers in the United States. (Pls. 56.1 ¶ 18; Def. 56.1 ¶ 18). Most of these products were infant and children's clothing and other textiles from Asia. (Pls. 56.1 ¶ 18; Def. 56.1 ¶ 18). In April 2013, Brooks Fitch entered liquidation and is no longer in business. (Pls. 56.1 ¶¶ 21–22; Def. 56.1 ¶¶ 21–22).

**B. Procedural History**

When Plaintiffs filed their initial Complaint on April 5, 2011, (ECF No. 1), this case was before Judge Dennis Cavanaugh. Concurrent with the Complaint, ITMC filed a request for a Temporary Restraining Order seeking a permanent injunction against Brooks Fitch. (ECF No. 1-3). Judge Cavanaugh denied ITMC's request for a permanent injunction. (ECF No. 16). Plaintiffs twice moved to amend the Complaint; however those motions were denied. (ECF Nos. 36, 44). On May 17, 2013, this matter was reassigned to Judge Faith Hochberg. (ECF No. 58). Then, on October 10, 2013, this Court took over these proceedings. (ECF No. 72).

On November 22, 2013, Plaintiffs moved to amend the Complaint once more. (ECF No. 73). On September 10, 2014, Magistrate Judge Joseph A. Dickson granted Plaintiffs' motion to amend, (ECF No. 88), and on September 16, 2014, Plaintiffs filed the operative Amended Complaint, (ECF No. 89), adding a direct claim against Safdieh by seeking to pierce Brooks Fitch's corporate veil. Over two years passed before this case reached the summary judgment stage, during which the Court and the parties negotiated various scheduling orders and conducted status conferences. On November 1, 2016, the parties filed simultaneous briefing on two motions for summary judgment. (ECF Nos. 129–146). The Court heard oral argument on the summary judgment motions on March 16, 2017. (ECF No. 150). The Court denied Plaintiffs' summary judgment motions. (ECF No. 151). The Court set this matter for a bench trial date of October 23,

2017. The parties submitted pretrial briefs, (ECF Nos. 180–81), and the Court conducted a one day bench trial on October 23. The trial pertained solely to issues of liability regarding Brooks Fitch and did not concern Plaintiffs' veil piercing and alter-ego arguments as to Safdieh. Following the trial, the Court directed the parties to submit their proposed findings of fact and conclusions of law. (ECF No. 183). They did so on December 15, 2017. (ECF Nos. 188, 189). Below are the Court's findings of fact and conclusions of law.

## II. **FINDINGS OF FACT**

The Court has considered the testimony and assessed the credibility of all the witnesses who testified and has also considered the documentary evidence presented at trial, and finds as follows.

From 2009 to 2011, Brooks Fitch purchased shipments of apparel from various Chinese manufacturers. (ECF No. 167 (Joint Statement of Stipulated Facts ("JSSF")) ¶ B1). The contracts between Brooks Fitch and these Chinese manufacturers were Free on Board or "F.O.B." contracts, meaning that the Chinese manufacturers performed under the contract once they delivered the purchased goods to the vessel or vessels in China that Brooks Fitch nominated for carriage to the United States. (JSSF ¶ B3). To get the goods to the United States, Brooks Fitch contracted with ITMC such that ITMC acted as Brooks Fitch's freight forwarding agent. (JSSF ¶ B4). The purpose of an international freight forwarding agent is to arrange shipments to and from the United States in international trade. (Trial Tr. at 111:22–112:3). ITMC then entered into an agreement with ONEL under which ONEL acted as the NVOCC for the shipments of the goods to the United States. (JSSF ¶ B4). The parties agree that ITMC was acting as an agent for ONEL in this capacity. (PFOF ¶ 59; ECF No. 188 (Defendant's Findings of Fact ("DFOF")) ¶ 53). ONEL thus arranged for the transportation of the goods from China to the United States. (JSSF ¶ B5).

4

Once ONEL received each shipment from the Chinese manufacturers, it issued an "on board" bill of lading for each shipment. (JSSF ¶ B5). ONEL was listed as the "Carrier" on each bill of lading at issue here. (Exs. 2001, 2006, 2009, 2012, 2015, 2021, 2024, 2027, 2032, 2041, 2050, 2061, 2065, 2069, 2072, 2075, 2081, 2085, 2088, 2091, 2102, 2106, 2111, 2113, 2121, 2123, 2131, 2141, 2151). ONEL then gave the ocean bill of lading to the respective Chinese manufacturer as a receipt and document of title. (JSSF ¶ B5). ONEL issued these bills of lading to the Chinese manufacturers through Cargo Services China (for mainland China manufacturers) and through Cargo Services Far East Limited (for the Hong Kong manufacturer). (Exs. 2001, 2006, 2009, 2012, 2015, 2021, 2024, 2027, 2032, 2041, 2050, 2061, 2065, 2069, 2072, 2075, 2081, 2085, 2088, 2091, 2102, 2106, 2111, 2113, 2121, 2123, 2131, 2141, 2151). These bills of lading are stamped such that they state that either Cargo Services China or Cargo Services Far East Limited issued the bill of lading "as agent for" either "Carrier" or "Ocean Navigator Express Line." (*Id.*).

This case concerns shipments from 14 different manufacturers with a combined value of $4,362,113.50. (JSSF ¶ B2). The shipments are broken out in the table below:

| Chinese Manufacturer | Dollar Value (USD) |
|---|---|
| Pearl Touch Industrial Co. | $302,386.20 |
| Wujiang First Import and Export Co. | $39,600.00 |
| Wuxi Hongrui Habit Co. | $158,100.00 |
| Jiangsu Saintek | $169,620.00 |
| Join Action | $100,248.00 |
| Xiamen Unibest | $229,335.00 |
| Dragonway Garment Ltd. | $1,061,054.58 |

5

| | |
|---|---|
| Famous Design | $559,763.28 |
| Shanghai Win-Wing | $725,155.38 |
| Shiandong Textiles | $335,482.20 |
| Foshan He Jun | $435,536.86 |
| Xiamen Jiasheng | $129,600.00 |
| Jiangyin Weiyu Textile | $45,264.00 |
| Zhangzhou Sin Lane | $70,968.00 |
| **TOTAL** | **$4,362,113.50** |

(JSFF ¶ B2).

Under normal industry practice, Brooks Fitch was supposed to pay the Chinese manufacturers for the shipments, and in return, Brooks Fitch would receive the original bills of lading from the Chinese manufacturers. (JSSF ¶ B6). Brooks Fitch would then present the bills of lading to ONEL in the United States, which would allow ONEL to release the goods to Brooks Fitch. (JSSF ¶ B6). That did not happen here. With the exception of partial payments of $40,000.00 to Join Action and $20,000.00 to Xiamen Unibest, Brooks Fitch never paid for those shipments. (JSSF ¶¶ B7, B9; PFOF ¶ 85).

Despite never paying for the shipments and thus not having possession of the original bills of lading, Brooks Fitch was able to obtain possession of the goods. (JSSF ¶ B8). ITMC released the goods to Brooks Fitch after Brooks Fitch entered into three indemnity agreements with ITMC and provided ITMC with numerous collateral checks referencing specific shipments totaling $3,343,356.26. (JSSF ¶¶ C1–3; PFOF ¶ 97 & n.1). The indemnity agreements covered the shipments from Pearl Touch Industrial Co., Xiamen Jiasheng, and Shiandong Textiles. (JSSF ¶¶

6

C1–3). Each indemnity agreement contained the same operative language. They state:

> This indemnification agreement ("Agreement") is entered into effective [Date] between Brooks Fitch Apparel Group LLC, 1370 Broadway, Suite 110, New York, New York 10018 ("Brooks Fitch") and International Transport Management Corp., 129 Washington Street, P.O. Box 1988, Hoboken, New Jersey 07030.
>
> For ten dollars ($10.00) and other good and valuable consideration, receipt of which is hereby acknowledged, Brooks Fitch and its successors and assigns agree to indemnify, hold harmless and defend Ocean Navigator Express Line Ltd., International Transport Management Corp. and Cargo Services Far East Limited, and their respective parents, subsidiaries and affiliates, and their respective officers, directors and employees from and against any actual or alleged claims, liabilities, losses, demands, causes of action, judgments, settlements and expenses (including without limitation, settlement costs and legal, accounting and other expenses in connection therewith), or other damages of any kind or nature arising out of or connected with the following shipments of apparel . . . .

(Exs. 2004, 2052, 2116). The indemnity agreements also state that they will be governed by New York law. (Exs. 2004, 2052, 2116).

With respect to the collateral checks, the table below shows the check number, the amount of the check, the invoice due to the shipper, and the corresponding shipper for which Brooks Fitch submitted the check as collateral.

| Manufacturer | Invoice Amount | Check Number | Check Amount |
|---|---|---|---|
| Pearl Touch Industrial Co. | $302,386.20 | 6439 | $58,893.00 |
| | | 6598 | $104,940.00 |
| | | 6694 | $138,552.60 |
| Wujiang First Import and Export Co. | $33,600.00 | 6931 | $6,300.00 |
| | | 7137 | $27,971.50 |
| Wuxi Hongrui Habit Co. | $158,100.00 | 6278 | $123,120.00 |
| | | 6925 | $6,300.00 |
| | | 7137 | $27,971.50 |

| | | | |
|---|---|---|---|
| Jiangsu Saintek | $169,620.00 | 6861 | $102,600.00 |
| | | 6928 | $69,300.00 |
| Join Action | $100,248.00 | 7412 | $96,729.00 |
| Xiamen Unibest | $229,335.00 | No check | No check |
| Dragonway Garment Ltd. | $1,061,054.58 | 8388 | $120,326.39 |
| | | 8389 | $171,197.50 |
| | | 8394 | $367,938.53 |
| | | 8395 | $295,084.62 |
| | | 8453 | $160,507.54 |
| Famous Design | $559,763.28 | 8393 | $110,733.00 |
| | | 8391 | $196,804.68 |
| | | 8390 | $126,523.20 |
| | | 8459 | $125,702.40 |
| Shanghai Win-Wing | $725,155.68 | 8578 | $564,782.70 |
| Shiandong Textiles | $335,482.20 | 8580 | $171,666.00 |
| | | 8579 | $93,811.20 |
| Foshan He Jun | $435,536.86 | No check | No check |
| Xiamen Jiasheng | $129,600.00 | 7126 | $129,600.00 |
| Jiangyin Weiyu Textile | $44,364.00 | No check | No check |
| Zhangzhou Sin Lane | $70,968.00 | No check | No check |

(JSSF ¶ C3; PFOF ¶ 97).

The checks served as collateral for ITMC and ONEL to release the goods to Brooks Fitch in the event that Brooks Fitch did not end up paying the Chinese manufacturers. (Trial Tr. 131:11–

8

20, 133:20–134:8). When it became clear that Brooks Fitch did not pay the Chinese manufacturers, and ITMC went to cash the checks, the checks bounced. (Trial Tr. 140:7–9).

Because Brooks Fitch never paid the Chinese manufacturers, many initiated lawsuits against ONEL, Cargo Services Far East Limited, and Cargo Services China in Hong Kong and mainland China. (Exs. 1000–02, 1010–11, 1016, 1018, 1020, 1022, 1024, 1029, 1031, 1033–37, 1040, 1046–47, 1051, 1055, 1060).

- Xiamen Unibest filed suit in the Xiamen Maritime Court against Cargo Services China on June 28, 2010. (Ex. 1031).
- Wujiang First Import and Export Co. filed two suits in the Shanghai Maritime Court against Cargo Services China on August 13, 2010. (Exs. 1010–11).
- Wuxi Hongrui Habit Co. filed three suits in the Shanghai Maritime Court against Cargo Services China on August 13, 2010. (Exs. 1016, 1018, 1020).
- Jiangsu Saintek filed two suits in the Shanghai Maritime Court against Cargo Services China on August 13, 2010. (Exs. 1022, 1024).
- Pearl Touch Industrial Co. filed three suits in the Shanghai Maritime Court against Cargo Services China on September 21, 2010. (Exs. 1000–02).
- Join Action filed suit in the District Court of Hong Kong against Cargo Services Far East and ONEL on October 15, 2010. (Ex. 1029).
- Xiamen Jiasheng filed suit in the Shanghai Maritime Court against Cargo Services China on December 20, 2010. (Ex. 1060).
- Dragonway Garment Ltd. filed five suits in the Shanghai Maritime Court against Cargo Services China on May 31, 2011. (Exs. 1033–37).
- Foshan He Jun filed two suits in the Shanghai Maritime Court against Cargo Services

China on June 20, 2011. (Ex. 1055).

- Shiandong Textiles filed suit in the Qingdao Maritime Court against Cargo Services China on August 15, 2011. (Ex. 1051).

- Shanghai Win-Wing filed two suits in the Shanghai Maritime Court against Cargo Services China on October 10, 2011. (Exs. 1046–47).

- Famous Design filed suit in the Shanghai Maritime Court against Cargo Services China on April 28, 2012. (Ex. 1040).

- Two companies, Jiangyin Weiyu Textile and Zhangzhou Sin Lane, sent letters to Cargo Services China, demanding payment for the goods under the bills of lading.[3] (Exs. 1062, 1065).

The following table lays out the amounts paid as a result of these lawsuits and demands for payment.

| Claimant | Amount Paid | Source |
| --- | --- | --- |
| Pearl Touch Industrial Co. | $228,697.96 | Exs. 1007–09 |
| Wujiang First Import and Export Co. | $39,964.93 | Exs. 1026, 1028, 1029 |
| Wuxi Hongrui Habit Co. | $160,613.49 | Exs. 1026, 1028, 1029 |
| Jiangsu Saintek | $166,718.00 | Exs. 1026, 1028, 1029 |
| Join Action | $55,000.00 | Ex. 1030 |
| Xiamen Unibest | $85,000.00 | Ex. 1030 |
| Shanghai Benyi Hongyuan Clothing Import and Export Co. (Dragonway Garment Ltd.; Famous Design; Shanghai Win-Wing) | $2,398,133.66 | Exs. 1033–50 |

---

[3] Zhangzhou Sin Lane's letter was also addressed to ONEL.

| Shiandong Textiles | $333,973.72 | Ex. 1030, 1052–53 |
| Foshan He Jun | $304,541.68 | Exs. 1030, 1055–56 |
| Xiamen Jiasheng | $214,053.84 | Ex. 1030 |
| Jiangyin Weiyu Textile | $N/A | N/A[4] |
| Zhangzhou Sin Lane | $151,280.31 | Exs. 1030, 1067 |
| Fees allotted to Shanghai Goodwin law firm | $17,028.91 | Exs. 1026, 1028, 1029 |
| **TOTAL** | **$4,155,006.50** | |

ONEL now claims that Brooks Fitch should indemnify it for the losses arising from the payments in the table above or that it is liable for that amount as a result of its breach of contract.

### III. CONCLUSIONS OF LAW

The legal issue at the center of this trial was whether ONEL actually suffered any damages. Brooks Fitch argues that ONEL has not suffered any damages, since the judgments and settlements paid out in the Chinese lawsuits were paid by Cargo Services China or Cargo Services Far East Limited. (Trial Tr. 25:10–26:7). ONEL contends that it is in fact the real party in interest and has standing to recover on an indemnity claim in this case because Cargo Services China and Cargo Services Far East Limited were acting as agents for ONEL. (ECF No. 189 (Pl.'s Proposed Conclusions of Law ("PCOL")) at 45).

The parties dedicated much time at trial and space in their pre- and post-trial papers to arguing whether ONEL was in fact in a principal-agent relationship with Cargo Services China

---

[4] ONEL claims that it settled this claim for $40,000; however, there is no exhibit indicating payment of a settlement in that amount to Jiangyin Weiyu Textile. The Court notes, however, that on page 30 of Exhibit 1030, there is a $40,000 payment to a Lin-Lin Fashion Int'l Co. with a payment timeline following the demand letter from Jiangyin Weiyu's lawyers. If ONEL can submit additional proof that this is indeed the $40,000 payment to Jiangyin Weiyu, the Court will amend its judgment.

11

and Cargo Services Far East Limited, with the Cargo Services entities acting as agents for ONEL. Plaintiff's contention is that, as agents of ONEL, the damages Cargo Services China and Cargo Services Far East Limited incurred in dealing with the Chinese lawsuits would somehow flow up to ONEL as principal. (PCOL at 45). After much handwringing and research, the Court was not able to find any law that stated that the damages paid out by agents in lawsuits with third-parties are attributable to a principal. However, that is not fatal to Plaintiff's case, nor must the Court make a finding as to whether ONEL, Cargo Services China and Cargo Services Far East Limited were in a principal-agent relationship as a matter of law.

In its post-trial brief, ONEL argues that it can recover for damages as the real party in interest under Federal Rule of Civil Procedure 17. The Court agrees with ONEL. The original Advisory Note to Rule 17 states:

> A recurring factual situation in maritime cases may lead to injustice if the requirement as to real party in interest is rigidly applied. When there are claims to be asserted on behalf of maritime cargo some or all of the following conditions may be present: (1) There are numerous lots of cargo and hence numerous potential claimants. (2) The true owner or other person entitled to sue cannot be readily determined. This results in part from the employment of diverse commercial instruments giving rise to problems of the passing of title. These may involve problems in the conflict of laws, including the laws of foreign countries. Questions also arise as to when the rights of an insurer as subrogee have been perfected. (3) The time for filing suit is short, either because of a short limitation period, such as the one-year period of the Carriage of Goods by Sea Act, or because the only practicable remedy is arrest or attachment of a vessel whose departure is imminent.

*Unilever (Raw Materials) Ltd. v. M/T Stolt Boel*, 77 F.R.D. 384, 389 (S.D.N.Y. 1977) (quoting 7A Moore's Federal Practice P 0.55(3), at 403). Furthermore, under traditional admiralty practice, "equitable principles rather than technical rules and forms should be the paramount consideration and . . . the objective is to do substantial justice between the parties." *Id.* at 389–90 (quoting *Esso Standard (Switz.) v. The Steamship Arosa Sun*, 184 F. Supp. 124, 127 (S.D.N.Y. 1960)). The *Unilever* Court also noted that Rule 17(a) "derives . . . from the special needs of the maritime

trade." *Id.* at 390.

*Unilever* involved a delivery of tallow from New York to Bromborough, England. *Id.* at 386. The plaintiff, Unilever, sued the defendants because the delivery was allegedly short. *Id.* According to the bill of lading, the shipper of the tallow was Lever Brothers Company, Inc. and the consignee was Unilever, the parent corporation of Lever. *Id.* The complaint was amended to substitute Unilever as the plaintiff for Lever. *Id.* The *Unilever* Court denied the defendants' motion to dismiss the amended complaint as time barred under the Carriage of Goods by Sea Act after the substitution of the plaintiff. *Id.* The Court reasoned that:

> The facts of this case simply do not demonstrate prejudice to the defendant accruing from having to defend against Unilever instead of Lever. In fact, the opposite conclusion is all but inescapable: there is simply no reason to permit a windfall for the defendants because the vagaries of corporate structure and maritime instruments of title misled the shipper into believing that it sued in behalf of its own loss. One cargo shortage is at issue; the cargo was shipped in the care of the defendants; there are only three "parties" in the action the shipper, the carriers and the consignee. Technical niceties of relationship or lack thereof between the shipper and the consignee ought not to obscure the facts that the defendant is exposed to only one kind and amount of liability no matter which plaintiff sues; that a loss plainly has occurred; and that a party who was no stranger to the business transaction initiated suit within the time limit in the not unreasonably mistaken belief that it had sustained the loss.

*Id.* at 390–91.

Other courts have applied similar reasoning when faced with the scenario where a corporate plaintiff is suing in place of its affiliate, which actually suffered damages. In *Prevor-Mayorsohn Caribbean, Inc. v. P.R. Marine Mgmt., Inc.*, the First Circuit addressed a case involving damage to thirteen trailer loads of produce shipped on vessels owned by the defendant. 620 F.2d 1, 2 (1st Cir. 1980). During trial, the president of Prevor Mayorsohn Caribbean ("PMC") testified that Prevor Mayorsohn International ("PMI"), of which PMC was a wholly-owned subsidiary, actually owned the produce as principals and that PMC sold the produce as agents for PMI and received a

commission. *Id.* The defendant then immediately moved for dismissal on the grounds that PMC was not the proper plaintiff. *Id.* The First Circuit reversed the District Court's decision to dismiss the action because PMC failed to show that it was the real party in interest. It reasoned that

> In cases like the present involving maritime commerce, Rule 17(a) has been construed to accommodate the somewhat flexible rules that have developed in the admiralty practice defining the parties who may properly commence an action for damage to cargo. *See generally* 2A Benedict on Admiralty, § 53 (7th ed. 1977). Not only has an exclusive interest in the damaged goods not been required in all cases, but courts have often looked to the practicalities of the situation in assessing the likelihood that a carrier might ultimately be exposed to a double recovery and, when satisfied that double recovery is not a threat, and that the plaintiff has a proper interest in maintaining the action, have allowed that plaintiff to maintain the action. *See Elia Salzman Tobacco Co. v. SS Mormacwind*, 371 F.2d 537, 540 (2d Cir. 1967) (the fact all other possible claimants to the damages were libelants and that their libels had been dismissed protected defendant against any possible double recovery); *Levatino Co. v. M/S Helvig Torm*, 295 F.Supp. 725, 728 n. 4 (S.D.N.Y. 1968) (since shippers were time barred from instituting new and separate action, possibility of double recovery was eliminated). Here the fact that Prevor and its parent company are clearly "all part of a single operation," *Salzman, supra* at 539, and further, as PRMM itself urges, that any new proceeding by Prevor International would be time barred, demonstrate that PRMM is amply protected against the possibility of exposure to subsequent suit. Where the carrier is thus "protected against double recovery, (it) has no concern with any equities between the owner or consignee and others." *Salzman, supra* at 540.

*Prevor-Mayorsohn*, 620 F.2d at 4–5.

The reasoning applicable here and set forth in *Unilever* and *Prevor-Mayorsohn* is not limited to maritime commerce. *See Global Aerospace, Inc. v. Platinum Jet Mgmt., LLC*, No. 09-60756, 2011 WL 2530943, at *7 (S.D. Fla. June 23, 2011) (stating that, in the context of an insurance dispute related to a plane crash, an agent can sue on behalf of its injured principal and citing to the reasoning behind Rule 17); *Fried, Krupp, GmbH, Krupp Reederei Und Brennstoff-Handel-Seeschiffarht v. Solidarity Carriers, Inc.*, 674 F. Supp. 1022, 1026 n.1 (S.D.N.Y. 1987) (noting that there is judicial authority "recognizing the ability of corporate entities to assert their affiliates' claims . . . under a 'real party in interest' analysis"); *Mitsui & Co. (U.S.A.) v. P.R. Water*

*Res. Auth.*, 528 F. Supp. 768, 776 (D.P.R. 1981) ("Numerous cases have held under Rule 17(a) that an agent who has contracted in his own name for a disclosed or undisclosed principal, or who acted as an agent during the course of the transaction involved in the litigation, may sue for damages suffered by the principal. Such an agent is a proper plaintiff even though the damages were sustained by another, he claims no financial interest in the transaction or litigation, and even though he did not have title to, or more than a transient possessory or custodial interest in, the property forming the subject of the dispute."); *Bache & Co. v. Int'l Controls Corp.*, 324 F. Supp. 998, 1004–05 (S.D.N.Y. 1971) (permitting stock broker to sue on behalf of its customers whose shares it tendered to buyer who refused to pay and arguing that there is no prejudice to defendant because there is no chance of double recovery).

The Court finds the logic espoused in the aforementioned cases particularly applicable here. Over the course of the long and tortured history of this case, the Court has made a concerted effort to streamline the issues and parties before it. That ONEL remains as Plaintiff is of no prejudice to Defendant and should not result in a windfall for Defendant. This is akin to the situation in *Unilever* where "defendant is exposed to only one kind and amount of liability no matter which plaintiff sues; that a loss plainly has occurred; and that a party who was no stranger to the business transaction initiated suit within the time limit in the not unreasonably mistaken belief that it had sustained the loss." 77 F.R.D. at 391. Nor is Brooks Fitch at risk of being subject to a double recovery. ITMC was dismissed from this action at trial, (Trial Tr. 30:7–15), and even if either of the Cargo Services entities were not barred by the "special res judicata principles" associated with Rule 17(a), *Prevor-Mayorsohn*, 620 F.2d at 4, any contract or fraud claims brought by the Cargo Services entities would be time barred. *See Kaufman v. i-Stat Corp.*, 165 N.J. 94, 127 (2000) (stating that the statute of limitations for common law fraud is six years); *Binder v.*

15

*Price Waterhouse & Co., L.L.P.*, 393 N.J. Super. 304, 309 (App. Div. 2007) (stating that the statute of limitations for breach of contract claims is six years); *First Indem. of Am. Ins. Co. v. Kemenash*, 328 N.J. Super. 64, 72 (App. Div. 2000) (stating that the statute of limitations for an indemnity claim is six years). Moreover, it is clear from the testimony of John Lau—the founder and majority shareholder of Cargo Services Far East Limited—that in this case ONEL, Cargo Services Far East Limited, and Cargo Services China are "all part of a single operation" and thus Brooks Fitch is "amply protected against the possibility of exposure to subsequent suit." *Prevor-Mayorsohn*, 620 F.2d at 5.

Based on the above, the Court finds that ONEL can properly bring this claim for damages against Brooks Fitch.

As to the grounds on which the Court finds Brooks Fitch liable, the indemnity agreements Brooks Fitch signed with respect to Pearl Touch Industrial Co., Xiamen Jiasheng, and Shiandong Textiles are broad enough to indemnify ONEL for damages paid out by Cargo Services Far East Limited. Indemnity agreements are "strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Jeanetti v. Casler Masonry, Inc.*, 133 A.D.3d 1339, 1340 (N.Y. App. Div. 2015). The language of the indemnity agreement "should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under the contract." *Id.* (quoting *Niagara Frontier Transp. Auth. v. Tri-Delta Constr. Corp.*, 107 A.D.2d 450, 453 (N.Y. App. Div. 1985)).

In this case, the indemnity agreements at issue for the Pearl Touch Industrial Co., Xiamen Jiasheng, and Shiandong Textiles agreements clearly cover losses incurred as a result of settlements or judgments from lawsuits. (Exs. 2004, 2052, 2116 (covering "any actual or alleged claims, liabilities, losses, demands, causes of action, judgments, settlements and expenses

(including without limitation, settlement costs and legal, accounting and other expenses in connection therewith), or other damages of any kind or nature arising out of or connected with the following shipments of apparel"). The question then, is whether these agreements indemnify ONEL against the losses paid out by Cargo Services Far East Limited and Cargo Services China. This Court finds that they do. The language of the indemnity agreements is quite broad. Those agreements state:

> For ten dollars ($10.00) and other good and valuable consideration, receipt of which is hereby acknowledged, Brooks Fitch and its successors and assigns agree to indemnify, hold harmless and defend Ocean Navigator Express Line Ltd., International Transport Management Corp. and Cargo Services Far East Limited, and their respective parents, subsidiaries and affiliates, and their respective officers, directors and employees from and against any actual or alleged claims, liabilities, losses, demands, causes of action, judgments, settlements and expenses (including without limitation, settlement costs and legal, accounting and other expenses in connection therewith), or other damages of any kind or nature arising out of or connected with the following shipments of apparel . . . .

(Exs. 2004, 2052, 2116). As written, the indemnity agreements indemnify ONEL and its "respective parents [and] subsidiaries" from losses or damages of any kind "arising out of or connected with" the shipments of apparel. This language indicates the kind of clear and unmistakable intent that New York courts require to enforce indemnity agreements. *See, e.g., Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 227 (S.D.N.Y. 2005) (applying New York law and upholding indemnity agreement which stated that the indemnitor "will indemnify [the indemnitees] and their 'affiliates' . . . for 'any loss, liability, claim, damage . . . , expense . . . , or diminution of value'"). The Court thus reads the indemnity agreements to indemnify ONEL from losses incurred by Cargo Services Far East Limited and Cargo Services China in connection with litigation arising out of the shipments of goods from Pearl Touch Industrial Co., Xiamen Jiasheng, and Shiandong Textiles.

Even if the indemnity agreements do not indemnify ONEL for damages incurred

17

by Cargo Services Far East Limited and Cargo Services China, the agreements clearly indemnify Cargo Services Far East Limited and Cargo Services China against losses incurred as a result of litigation, and the Court has determined that ONEL can sue for those damages under Rule 17. Furthermore, Brooks Fitch is liable for the damages arising out of the shipments under a breach of contract theory. To establish a breach of contract claim, ONEL must prove that it entered into a contract with Brooks Fitch, ONEL performed under the terms of the contract while Brooks Fitch did not, and Brooks Fitch's breach caused ONEL damages. *Pollack v. Quick Quality Rests., Inc.*, 452 N.J. Super. 174, 188 (App. Div. 2017) (citing *Globe Motor Co. v. Igdaley*, 225 N.J. 469, 482 (2016)).

Here, the parties entered into an agreement when Brooks Fitch offered ITMC collateral checks in order to release the goods from the Chinese manufacturers without providing the bills of lading. ONEL was a party to this agreement as the disclosed principal of its release agent, ITMC. ITMC, after getting confirmation from ONEL, agreed to release the goods to Brooks Fitch once it received the collateral. Brooks Fitch did not perform under this agreement, because the collateral checks were worthless and so did not fulfill their purpose of providing security to ONEL in the event that Brooks Fitch never paid the Chinese manufacturers. As a result of Brooks Fitch's failure to pay the Chinese manufacturers and the worthless nature of the collateral provided, ONEL was exposed to liability across the various lawsuits detailed above.

### IV. CONCLUSION

For the reasons stated above, the Court will enter judgment in favor of Plaintiff in the amount of $4,155,006.50. An appropriate Order and Judgment accompanies this Opinion.

DATED: April 26th, 2018

HON. JOSE L. LINARES
Chief Judge, United States District Court