Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **INTERNATIONAL TRANSPORT MANAGEMENT CORPORATION**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **BROOKS FITCH APPAREL GROUP, LLC**, *et al.*, <br><br> Defendants. | Civil Action No. 11-1921 (ES) (JAD) <br><br> OPINION |

**SALAS, DISTRICT JUDGE**

This matter comes before the Court by way of Plaintiff Ocean Navigator Express Line's ("ONEL") Motion for Summary Judgment ("Motion"). (D.E. No. 209). Defendants Joseph Safdieh ("Safdieh") and Brooks Fitch Apparel Group LLC ("Brooks Fitch") (together, "Defendants") have not filed an opposition,[1] and Plaintiff has filed a reply. (D.E. No. 215). The

---

[1] On February 7, 2019, Defendants' counsel, Mr. Heinze, filed a request to extend the deadline to file an opposition (D.E. No. 213), which Chief Judge Linares (ret.) granted. (D.E. No. 214). Defendants never filed their opposition. By letter dated July 15, 2019, defendant Safdieh indicated that he had asked Mr. Heinze to withdraw as counsel "in numerous emails from March 2019 to last week," but Mr. Heinze "failed to respond." (D.E. No. 217). Safdieh requests that the Court grant him 90 days to find new counsel and that the Court not issue a decision on the instant motion until he finds new counsel. (*Id.*).

Safdieh fails to provide any valid reason why he waited more than four months after briefing closed to make this request (and start his search for new counsel), particularly since he was apparently aware of his counsel's failure to file an opposition and has been requesting his withdrawal since at least March. (*See id.*). Nor, as Plaintiff explains in its response letter (D.E. No. 218), is this the first time that Safdieh has had disputes with his attorneys, causing delays to this action. (*See, e.g.*, D.E. No. 105 (motion to withdraw citing Safdieh's failure to pay legal bills); D.E. No. 114 (motion to withdraw citing Safdieh's repeated failures to pay retainer and legal bills, and "abject dishonesty" towards counsel and his firm); *see also* D.E. Nos. 119 & 123). Yet, in the past Safdieh was able to file timely notices with the Court. (*See e.g.*, D.E. No. 121). Moreover, parties are "held accountable for the acts and omissions of their chosen counsel." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993)*; Link v. Wabash R. Co.,* 370 U.S. 626, 633–34 (1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent."). In short, the Court is unable to find excusable neglect under the circumstances. The Court, therefore, denies Safdieh's untimely request and decides the instant motion as unopposed.

Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. *See also* L. Civ. R. 78.1(b). For the reasons set forth below, the Court grants Plaintiff's Motion.

**I.    Background**[2]

The Court directs the parties to Chief Judge Linares' (ret.) April 26, 2018 Opinion for a detailed background of the facts giving rise to this litigation. That Opinion followed a bench trial held on October 23, 2017. The Court issued its Opinion along with an Order and Judgment on April 26, 2018 finding in favor of ONEL and awarding it $4,155,006.50. (D.E. Nos. 190–91). The Court later amended the judgment and awarded ONEL $4,195,006.50. (D.E. Nos. 205–06). The Court, however, had previously bifurcated the case on issues of damages and liability. Now before the Court is the issue of liability. As such, the Court will limit its additional background to issues related to liability.

Defendant Safdieh was the principal officer and sole managing member of Defendant Brooks Fitch. (Pl. 56.1 ¶ 1). In October of 2001, Safdieh founded Brooks Fitch. (*Id.* ¶¶ 22, 24). However, when he founded Brooks Fitch, Safdieh organized it such that his son, Eli, was the sole member of the LLC. (*Id.* ¶ 26). Despite this organizational structure, Safdieh "controlled Brooks Fitch," and had final authority over financial transactions. (*Id.* ¶¶ 34–37). Despite not being a member of the LLC at its outset, Safdieh made personal guarantees to lenders as security for loans to Brooks Fitch. (*Id.* ¶¶ 46–63).

In 2008, it appeared that Brooks Fitch was a viable business. (*Id.* ¶ 74). At the end of that

---

[2] These background facts are taken from the Plaintiff's statement of material facts, pursuant to Local Civil Rule 56.1, (D.E. No. 210, Plaintiff's Rule 56.1 Statement of Material Facts ("Pl. 56.1"). The Court will "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of fact." *Globespanvirata, Inc. v. Tex. Instrument, Inc.*, No. 03-2854, 2005 WL 3077915, at *2 (D.N.J. Nov. 15, 2005); *see also* L. Civ. R. 56.1 ("Each statement of material facts . . . shall not contain legal argument or conclusions of law.").

year; however, the business reported a net income of just over $11,000. (*Id.* ¶ 75). Yet at the same time, Brooks Fitch paid Safdieh $400,000 in sales commissions. (*Id.* ¶ 76). In 2009, Brooks Fitch reported net sales of over $19 million and gross profit of over $6 million, yet its after tax net income was only $3,097. (*Id.* ¶ 89). This appears to be due in part to large outlays of cash to Safdieh. Safdieh received $81,700.05 in salary for four weeks of work. (*Id.* ¶ 102). Brooks Fitch also loaned Safdieh $659,200. (*Id.* ¶ 103). Safdieh also received $1,430,800 in sales commissions in addition to travel and entertainment expense payments totaling $658,613. (*Id.* ¶¶ 105–06).

Safdieh also used Brooks Fitch's bank account to pay for his own expenses. Between July 3, 2009 and July 27, 2009, Safdieh withdrew $33,873.48 from a Brooks Fitch account at JPMorgan Chase to cover eleven separate expenses. (*Id.* ¶¶ 114–15). These expenses included, for example, payments to Olympic Tower Condominium and to Bergdorf Goodman. (*Id.* ¶ 115). Brooks Fitch did not own or rent an apartment at Olympic Tower Condominium or do any business with Bergdorf Goodman; however, Safdieh's son and wife owned an apartment at Olympic Tower Condominium and Safdieh's wife had a personal account at Bergdorf Goodman. (*Id.* ¶¶ 116–17). The only person who could have authorized these payments was Safdieh. (*Id.* ¶ 151).

On March 1, 2010 Safdieh himself became the sole member of Brooks Fitch when his sons withdrew as members of the LLC. (*Id.* ¶ 124). Up until that point, Safdieh had no ownership interest in Brooks Fitch. (*Id.* ¶ 125). In the two months prior to Safdieh taking sole ownership of the LLC in 2010, Brooks Fitch operated at a loss and had a negative cash balance, yet still paid Safdieh sales commissions in the amount of $397,067 for those two months. (*Id.* ¶ 132). As of March 1, 2010, Safdieh began reporting Brooks Fitch's income and expenses to the IRS as part of his personal tax return. (*Id.* ¶ 133).

After he took sole ownership of the LLC, Brooks Fitch's payments to Safdieh remained

3

outsized relative to its earnings. For the remainder of 2010, Brooks Fitch reported a net profit of $103,427 based on a gross income of $2,603,134. (*Id.* ¶ 140). Records show that Brooks Fitch paid Safdieh $1,225,800 in sales commissions for that same period. (*Id.* ¶ 143). Brooks Fitch's books show these sales commissions were separated out from the other salaries and wages paid by the company in 2010. (*Id.* ¶ 145). Brooks Fitch also wrote checks out to cash totaling $505,200 that were cashed by Safdieh during 2010. (*Id.* ¶ 147). On top of that, Brooks Fitch wrote checks specifically addressed to Safdieh totaling $689,250 over that same time period. (*Id.* ¶ 148). These checks were not used to pay salaries, sales commissions, or loans. (*Id.* ¶ 149).

As detailed in the Court's previous Opinion, Brooks Fitch had incurred substantial liabilities to various Chinese manufacturers by 2011 that it could not pay, and eventually became insolvent and ceased operations that year. (*See generally* D.E. No. 205). Yet during that year, the company continued to issue payments to Safdieh in amounts totaling $938,791.27. (Pl. 56.1 ¶ 196). When one of Brooks Fitch's lenders foreclosed on the business in 2012, the notice of foreclosure was sent to Safdieh's home address, the property foreclosed upon was Safdieh's home in Deal, New Jersey, and the notice of foreclosure stated that Safdieh and his wife owed the lender $2,767,530.07, which was the amount owed by Brooks Fitch. (*Id.* ¶¶ 224–27).

## II. Legal Standard

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding disputed issues of material fact, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A]t the summary judgment stage the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

Where, as here, summary judgment is unopposed, the Court may grant summary judgment so long as the motion and the supporting materials "show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3); *Houston v. Township of Randolph*, 934 F. Supp. 2d 711, 723 (D.N.J. 2013). The Court must still analyze Plaintiff's Motion under the standard of Rule 56. *Houston*, 934 F. Supp. 2d at 723. Under Local Civil Rule 56.1, "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."

As mentioned above, there has already been a bench trial on the issue of Brooks Fitch's liability and damages after which the Court issued an Opinion, Order and Judgment on April 26, 2018 finding in favor of ONEL. (D.E. Nos. 190–91). Because Brooks Fitch has ceased operations and is insolvent, ONEL now seeks to pierce the corporate veil to hold Safdieh responsible for the damages apportioned to Brooks Fitch at the previous trial.

## III. Analysis

Whether or not this Court should pierce the corporate veil is a question of state law. *MSA Prods., Inc. v. Nifty Home Prods., Inc.*, 883 F. Supp. 2d 535, 540 (D.N.J. 2012). Under New Jersey law, the law of the state under which an LLC is formed governs the veil piercing analysis. *Mark IV Transp. & Logistics v. Lightning Logistics, Inc.*, 705 F. App'x 103, 106 (3d Cir. 2017) (citing

5

the New Jersey Limited Liability Company Act, N.J.S.A. 42:2C-57(a)(2)). Thus, because Brooks Fitch was an LLC formed in New York, (Pl. 56.1 ¶ 22), New York law governs the veil-piercing analysis.

"Under New York law, an owner is liable for the acts of a corporation when the corporation is merely an 'alter ego' of the owner." *Sentry Ins. a Mutual Co. v. Weber*, 720 F. App'x 639, 641 (2d Cir. 2017). "[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in [the] plaintiff's injury." *Supreme Energy, LLC v. Martens*, 145 A.D.3d 1147, 1150 (N.Y. App. Div. 2016) (quoting *Morris v. N.Y. Dep't of Taxation & Fin.*, 623 N.E.2d 1157, 1160–61 (N.Y. 1993)). In assessing these factors, courts look at "the overlap in ownership, officers, director[s] and personnel, the capitalization of the corporation, any commingling of assets and the presence, or absence, of the formalities that attend the corporate form." *Id.* at 1150–51 (quoting *Kain Dev. LLC v. Kraus Props., LLC*, 130 A.D.3d 1229, 1235 (N.Y. App. Div. 2015). However, the analysis is not limited to these factors, and the court may consider the totality of the circumstances. *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.* 933 F.2d 131, 138 (2d Cir. 1991). When the owners of the corporation use it "as a mere device to further their personal rather than the corporate business," that domination is key to piercing the corporate veil so long as the owners "abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Morris*, 623 N.E.2d at 141–42. As for the "fraud or wrong" in the second prong of the test, the party seeking to pierce the corporate veil need not prove actual fraud, but must only show a "fraud or wrong that injured the party

6

seeking to pierce the veil." *Sentry Ins.*, 720 F. App'x at 641.[3]

### A. Whether Safdieh Dominated Brooks Fitch

#### i. Overlap in Ownership, Officers, Directors, and Personnel

Where a business organization's officers and directors are nonfunctioning, that may be an indication that a corporation is a shell and deserving of having its veil pierced. *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989); *Wasau Bus. Ins. Co. v. Turner Constr. Co.*, 141 F. Supp. 2d 412, 418 (S.D.N.Y. 2001). As mentioned above, Safdieh founded Brooks Fitch in October of 2001. (Pl. 56.1 ¶¶ 22, 24). However, when he founded Brooks Fitch, Safdieh organized it such that his son, Eli Safdieh, was the sole member of the LLC. (*Id.* ¶ 26). At that time, Eli Safdieh was just 19 years old. (*Id.* ¶ 27). Despite this organizational structure, Safdieh "controlled Brooks Fitch," and had final authority over financial transactions. (*Id.* ¶¶ 34–37). In 2008, Eli's younger brother Jack became a 50% owner of Brooks Fitch. (*Id.* ¶ 70). He was just 17 years old at the time. (*Id.* ¶ 71). Even though Safdieh's two sons owned 100% of the company, Safdieh himself still controlled the business, evidenced by his execution of a cash collateral agreement with the factoring firm Rosenthal & Rosenthal. (*Id.* ¶¶ 56–57, 73 (detailing the fact that a guarantee from Safdieh was critical even though he was not a member of the LLC because he "owned the company" and "was a driving force behind the company"). There is also testimony from Brooks Fitch employees that Safdieh was the "boss" even when he was not a member of the LLC. (*Id.* ¶¶ 35–36). Eventually, on March 1, 2010, Safdieh became the sole shareholder of Brooks Fitch. (*Id.* ¶ 133).

It is apparent from the foregoing evidence that Eli and Jack Safdieh were mere figureheads and that Safdieh controlled the company despite the initial ownership of the company by his sons.

---

[3] New York's veil piercing framework applies to LLCs. *Retropolis, Inc. v. 14th Street Dev. LLC*, 17 A.D.3d 209, 210 (N.Y. App. Div. 2005).

7

### ii. *Capitalization of the LLC*

The inadequate capitalization of a firm is a factor that weighs in favor of piercing the corporate veil. *Simplicity Pattern Co. v. Miami Tru-Color Off-Set Serv., Inc.*, 210 A.D.2d 24, 25 (N.Y. App. Div. 1994). Brooks Fitch arranged for financing through a factoring agreement with Rosenthal & Rosenthal. (Pl. 56.1 ¶¶ 49–52). That agreement required Brooks Fitch to have working capital of at least $500,000. (*Id.* ¶ 50). Brooks Fitch repeatedly violated this factoring agreement by failing to maintain the necessary amount of working capital, yet Rosenthal & Rosenthal repeatedly waived these violations. (*Id.* ¶¶ 69, 78, 95–96). Additionally, Brooks Fitch's own accountant testified that he determined that the company was undercapitalized when writing and researching his 2009 Accountant's Review Report. (*Id.* ¶ 98). In fact, in 2009, the accountant determined that Brooks Fitch's liabilities exceeded it's assets by $628,652.00 and that the company only had a cash reservoir of $9,788.00 at the end of that year. (*Id.* ¶¶ 87, 89, 91).

From 2010 to 2011, Brooks Fitch continued to be undercapitalized. It started 2011 with just under $34,000 in its bank account, and as a result, Rosenthal & Rosenthal requested an additional $400,000 of personal collateral from Safdieh along with another $400,000 of collateral from a third party. (*Id.* ¶¶ 152–54, 161). Finally, in 2011, Brooks Fitch failed to meet its financial obligations and Rosenthal & Rosenthal had to offset Safdieh's personal collateral as well as the third-party collateral against its credit to Brooks Fitch. (*Id.* ¶¶ 161–194, 219–223). The evidence thus shows that Brooks Fitch was consistently undercapitalized, particularly in light of the large payments it made to Safdieh, including millions of dollars in sales commissions, (*see e.g., id.* ¶¶ 76, 105–06, 143).

### iii. *Commingling of Assets*

The commingling of assets and the use of corporate funds for personal use are factors that

indicate a disregard for the corporate form and weigh in favor of a court piercing the corporate veil. *E. Hampton Union Free Sch. Dist. V. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 127 (N.Y. App. Div. 2009). Safdieh used Brooks Fitch's corporate funds to pay for various personal expenditures, including a mortgage on an apartment in Olympic Tower, charges at Bergdorf Goodman, a luxury department store, and utilities for Safdieh's New Jersey home. (Pl. 56.1 ¶¶ 114–17). The Olympic Tower apartment belonged to Safdieh's son Eli and his wife. (*Id.* ¶ 116). Brooks Fitch had no business relationship with Bergdorf Goodman, but both Safdieh and his wife had a personal account there. (*Id.* ¶ 117). Nor did Brooks Fitch own any property in New Jersey for which it would need to make payments to New Jersey utilities. (*Id.* ¶ 118). Safdieh also reported Brooks Fitch's income and expenses to the IRS as part of his personal tax return after March 1, 2010. (*Id.* ¶ 133). There is evidence showing Safdieh used Brooks Fitch's corporate bank account for personal expenses, which again weighs in favor of piercing the corporate veil.

*iv. Corporate Formalities, or Lack Thereof*

In general, an LLC observes fewer corporate formalities than a corporation. *See Capricorn Investors III, L.P. v. Coolbrands Int'l, Inc.*, No. 603795/06, 2009 WL 2208339, at *6 (N.Y. Sup. Ct. July 14, 2009) (noting that the purpose of an LLC is to allow a member to participate in the management of a firm without exposure to personal liability, and that "LLCs generally have operating agreements, which may include meeting requirements, or other such formalities"); *accord De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 666 (S.D.N.Y. 2015) (applying Delaware law and noting that less emphasis is placed on whether the LLC observed formalities in the veil-piercing analysis because fewer formalities are legally required). Accordingly, the Court does not find that this factor weighs either for or against piercing the corporate veil.

####### v. *Whether the Dominating Entity Guaranteed the Debts of the Firm*

One additional factor that Courts may consider in assessing whether it should pierce the veil of a business entity is whether the dominating individual or entity guaranteed the debts of the firm. *Wm. Passalacqua Builders*, 933 F.2d at 139. As described above, Safdieh made several personal guarantees as collateral for the debts of Brooks Fitch, including mortgages on his property in Deal, New Jersey, cash collateral, and an agreement guaranteeing repayment "of any amounts owed to Rosenthal and Rosenthal by Brooks Fitch." (Pl. 56.1 ¶¶ 42–44, 55, 59, 61). In fact, when one of Brooks Fitch's lenders foreclosed on the business in 2012, the notice of foreclosure was sent to Safdieh's home address, the property foreclosed upon was Safdieh's home in Deal, New Jersey, and the notice of foreclosure stated that Safdieh and his wife owed the lender $2,767,530.07, which was the amount owed by Brooks Fitch. (Pl. 56.1 ¶¶ 224–27). This factor also weighs in favor of piercing the corporate veil.

Given the totality of the circumstances discussed herein, the Court concludes that Joseph Safdieh exercised domination and control of Brooks Fitch. The Court now turns to whether that domination was used to commit a fraud or wrong against ONEL.

### B. Whether Safdieh Used His Domination of Brooks Fitch to Commit a Fraud Against ONEL

The use of one's domination and control over a company to divert funds from the company's coffers into a personal account such that the company is unable to comply with its contractual obligations constitutes a wrong sufficient to pierce the corporate veil. *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, 386 F. Supp. 2d 461, 475–76 (S.D.N.Y. 2005). There is ample evidence in the record to suggest that Safdieh paid himself disproportionately large sums of money, depleting Brooks Fitch's reserves in the process, such that it was unable to comply with its contractual obligations.

It was conclusively established at trial that from 2009 to 2011, Brooks Fitch purchased apparel from various Chinese manufacturers and that Brooks Fitch never paid for these goods. (D.E. No. 190 at 4, 6). In order to obtain the apparel, Brooks Fitch normally would have had to pay the manufacturers directly so that ONEL, which was responsible for arranging for the transport of the goods from China to the United States, could release the goods to Brooks Fitch. (*Id.* at 6). Because Brooks Fitch did not pay the manufacturers, it did not have the original bills of lading for the shipments, which it was required to present to ONEL for release of the goods. (*Id.*). Thus, to arrange for the release of its merchandise, Brooks Fitch entered into indemnification agreements with ONEL and provided ONEL with collateral checks to cover the cost of the goods. Those checks bounced, and ONEL was left financially exposed to lawsuits in China. (*Id.* at 8–9).

Meanwhile, during that same time period, Safdieh paid himself enormous amounts of money in sales commissions: $1,430,800 in 2009, $1,605,100 in 2010, and $920,264.07 in 2011. (Pl. 56.1 ¶¶ 105, 143, 200). Safdieh also received checks from Brooks Fitch made out to "petty cash" in the amount of $505,200 in 2010, in addition to a cash disbursement from the company in the amount of $689,250 during that same year. (*Id.* ¶¶ 146–48). In 2011, Safdieh received a total of $938,791.27 from Brooks Fitch in checks and electronic transfers. (*Id.* ¶ 196). Furthermore, as mentioned above, Safdieh used Brooks Fitch's corporate account to pay for his and his family's personal expenses. *Supra* Part III.A.iii.

All the while, Brooks Fitch operated at a loss with minimal cash on hand. In 2009, Brooks Fitch's liabilities exceeded its assets by $628,652. (Pl. 56.1 ¶ 87). That same year, Brooks Fitch had net sales of $19,296,067 and gross profit of $6,289,059, but an after-tax net income of just $3,097. (*Id.* ¶ 89). At the end of the year, the company had cash on hand of only $9,788, despite owing nearly a million dollars to the various Chinese manufacturers. (*Id.* ¶ 91). In 2010, Brooks

Fitch had a gross income of $2,603,134, but expenses of $2,499,707 leading to a profit of $103,427. (*Id.* ¶ 140). The company ended the year with just $33,833.56 in its bank account. (*Id.* ¶ 161). At this point, Brooks Fitch owed the Chinese manufacturers $1,762,075.50. (*Id.* ¶ 134). By July of 2011, Brooks Fitch was insolvent. That year, it had a loss of $1,643,986.00.[4] (*Id.* ¶ 212). The facts thus show that Safdieh's hefty payments to himself from Brooks Fitch either contributed to or worsened Brooks Fitch's dire financial condition, rendering it unable to pay the Chinese manufacturers and unable to make do on its indemnification and collateral obligations to ONEL. Such behavior constitutes a wrong sufficient to pierce the corporate veil. *Fannie Mae v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 320 (E.D.N.Y. 2010).

## IV. Conclusion

For the aforementioned reasons, ONEL's motion for summary judgment to pierce Brooks Fitch's corporate veil is granted, and ONEL is granted a judgment against Safdieh in the amount of $4,195,006.50. ONEL may now also submit its calculations for pre- and post-judgment interest.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

[4] The Court acknowledges that Plaintiff's 56.1 Statement quotes a loss of $1,323,612.00. (*Id.* ¶ 212). However, based on the sources of these figures and the Court's own math, the Court concludes that the correct statement of Brooks Fitch's loss in 2011 is $1,643,986.00. (*See also* D.E. No. 135 ¶ 97; D.E. No. 139 ¶ 97).